United States District Court
Southern District of Texas
FILED

APR 2 4 2000

MICHAEL N. MILBY
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| SEAN W. b/n/f MARCIA W. § | |
| § | |
| VS. § | |
| § | C.A. NO. C-00-068 |
| CORPUS CHRISTI § | |
| INDEPENDENT SCHOOL DISTRICT, § | |
| NUECES COUNTY, AND STEVE § | |
| SCHWERIN, CHIEF PROBATION § | |
| OFFICER § | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Fact

1.  "Sean is a 13-year old male student who attends school at Baker Middle School within the Corpus Christi Independent School District. Sean completed the seventh grade at the end of the 1998-1999 school year." (Exhibit 1, p. 2)

2.  "Sean is eligible for special education placement, programs and services as a student who has the following multiple disabilities: Tourette's Syndrome, Obsessive Compulsive Disorder ("OCD"), Attention Deficit/Hyperactivity Disorder ("ADHD"), and Depression." (Exhibit 1, p. 2)

3.  Sean's disabilities specifically affect his behavior. His OCD causes him to do actions repetitively until he feels a release of the drive compelling him to do it. His ADHD causes him to be loud at times, yelling when he does not know that he is yelling. Sean is also impulsive and impatient as a part of being hyperactive. Sean's Tourette's Syndrome causes him to impulsively

Page 1

31.

say inappropriate and sometimes insulting and obscene things as a part of his disorder. Finally, Sean suffers from depression. (Exhibit 1, p. 2)

    4. "Sean's behaviors associated with his Tourette's Syndrome are variable. Sometimes the symptoms can wax and wane in severity throughout the years. Some specific behaviors can manifest themselves and then fade away. Sean has coprolalia which is not only the tendency to utter obscene and profane language but also aggressive and profane statements. Sean has corpropraxia which causes him to make obscene gestures. Sean also has echoproxia where he imitates and mimics other peoples behavior. He also has echolalia which is repetition of others and what they say and as well as what he says. Sean is currently taking medication for his disabilities." (Exhibit 1, p. 3)

    5. "Sean's mother took specific steps to apprise Sean's teachers of his disability, Sean's mother specifically allowed the District contact with Sean's pediatric psychiatrist. Sean's mother also gave Baker Middle School teachers books at her expense, and video tapes. Mrs. W. also performed an in-service education and spoke with teachers, staff members, and faculty administration about Sean's disabilities." (Exhibit 1, p. 3)

    6. "Ms. W. specifically met with Kathy Bergenzer, who is the special education teacher at Baker Middle School. Ms. Bergenzer ordered books from the Tourette's Syndrome Association through Ms. W. and assured Ms. W. that she would share the information about Sean's disabilities with her colleagues." (Exhibit 1, p. 3)

7. "At the end of Sean's sixth grade he entered puberty and began to have "breakthrough" symptomatic problems and behavior. When this was brought to the attention of school officials at a March 12, 1998 ARD it was determined that a Behavior Intervention Plan ("BIP") would be established for the following year. The BIP in place for his seventh grade year described that intervention for his symptomatic behaviors should "redirect in a calm, non-confrontational manner," and that if intervention is "not effective to calm him - the parent may be called for emergency removal." (Exhibit 2, p. 16).

8. It was specifically noted in the ARP notes that Sean W. "has been experiencing some behavior problems and the doctor has been trying new medications. The counseling IEP was reviewed. Mrs. Doughty reported that Sean continues to exhibit problems calming down. (Exhibit 2, p.17).

9. Because of some breakthrough aggressive actions, Nora Garza, the Assistant Principal, requested that Sean be assigned a para-professional for the seventh grade until his medication took effect and he became more in control of his behavior." (Exhibit 1, p. 3)

10. "Eventually, the para-professional who stayed with Sean throughout the year, was Ben Rios, who was represented to be a qualified, trained para-professional. Mr. Rios had not been trained in crisis intervention and the Corpus Christi ISD safety approved handling/restraint techniques for children with behavioral problems." (Exhibit 1, p. 3) (Exhibit 11).

11. "Ms. W. understood that in implementing Sean's BIP that officials would attempt to redirect him in a calm, non-confrontational manner and would have the opportunity to earn points on a point system if he followed designated rules. She also understood that if Sean had problems that warranted In-School Suspension ("ISS") that he would be assigned ISS for non-symptomatic behaviors unrelated to his disability. It was also understood that he would not be punished for behaviors that were related to his disability. As a part of his behavior plan he could also elect timeout to see the counselor, the nurse, or to go to his Content Mastery Class ("CMC"). As a last resort it was understood that if Sean were upset and all techniques has previously been tried and failed that Sean would not stay on campus if he posed a physical threat to himself or someone else and that the District would call Sean's parents under an emergency removal plan to pick him up and keep him out until he regained his composure." (Exhibit 1, p. 3)

12. "Mr. Rios' behavior was overly restrictive on Sean. Sean felt as he had no privacy and was constantly being monitored. Mr. Rios also began to criticize Sean about his physical and verbal ticks and his coprolalia. In Ms. W.'s opinion Mr. Rios began to act as Sean's personal disciplinarian. Ms. W. contacted Kathy Bergenzer and Nora Garza several times about Mr. Rios' restrictive practices. Sean had also told Ms. Bergenzer that Mr. Rios watched him too closely." (Exhibit 1, p. 4)

13. Sean began to have psychological symptoms that resulted in his hospitalization in November of 1998. Mr. Rios continued to pull Sean out of class for symptomatic behaviors and take him down to the office to have Sean written up and be given detention or placed in ISS. As a result of the additional stress, Sean was getting more frustrated and having symptoms such as stomach aches and headaches. Even though Ms. Bergenza was informed of Mr. Rios' inappropriate behavior, Sean' depression deepened and he began showing signs of school phobia and shutting down. When Sean began to sleep 20 of 24 hours in the day he was hospitalized November 19-30, at the Bay View Hospital for psychiatric reasons. (Exhibit 1, p. 4)

14. At a November 1998 ARD Ms. W. explained to school officials the stresses that cause Sean's behavior to deteriorate, she specifically mentioned Sean's problems with his para-professional and the para-professional's inappropriate behavior. She also told the ARD committee of Sean's doctors observations of the stressors being caused from Sean's relationship with Mr. Rios. (Exhibit 3). In a cluster meeting held in January 1999, Sean's BIP was modified to include more rewards for positive behavior, and it was again noted that the parents would be called in the event of an emergency removal. (Exhibit 1, p. 4) (Exhibit 4).

15. "One symptom of Sean's disability is that when he feels that he is overwhelmed and over stressed, he relieves the internal pressure by running and climbing something such as a tree or a flag pole." (Exhibit 1, p. 4)

16. "On February 1, 1999, Sean was placed in ISS with Mr. Rios' recommendation for making an inappropriate statement that included profanity. Ms. Nora Garza also filled out a suspension notice because of Sean's claimed persistent misbehavior. Ms. Garza also attempted to temporarily suspend Sean for running out in the school yard and climbing a tree but then styled the suspension as an "emergency removal." (Exhibit 1, p. 5) (Exhibit 5).

17. "On another occasion Sean was disciplined because mr. Rios reported what Sean had said with another student during a private conversation." (Exhibit 1, p. 5) (Exhibit 6).

18. On February 19, 1999, Sean W's mother wrote a letter to the assistant principal to apologize for his behavior and that his medications had not worked as they had hoped. She said she would refer him to his physician to discuss the behaviors. (Exhibit 7).

19. On March 3, 1999 Sean spent the first three periods in the school clinic, in the seventh period he became upset during an argument he had with his classmates. The substitute teacher who was in Sean's class at the time instructed Sean to go to CMC. Sean refused to comply because of previous teasing at CMC and said that he wanted to go climb a tree. He was unusually angry. During the confrontation with the teacher, Mr. Rios left the classroom to get the campus based security officer, De La Garza. Immediately prior to the confrontation with Officer De La Garza, Ms. Bazan, a teacher in a nearby classroom, calmed Sean down so he would leave the classroom. Sean wanted to go outside so he could explain the situation. (Exhibit 9). Officer De La Garza began to grab Sean's

hands and arms which caused Sean to thrash about, swing his arms and become progressively louder. Sean was then handcuffed and forcible taken to the school's office. Sean was subsequently arrested for assaulting a police officer and taken to juvenile jail facility. (Exhibit 1, p. 5)

20. When Sean was transported to the Juvenile Justice Center, he was met by his parents who were told by an officer that they had to wait. The parents were not advised that he would be strip searched (he was not suspected of possessing a weapon or drugs). He was told to take off his clothes and to "squat and cough." The search was performed by an ordained minister.

21. CCISD did not have an agreement with local law enforcement agencies concerning overlapping jurisdiction, but states that CCPD would not be used to transport CCISD arrestees. (Exhibit 12).

22. Officer De La Garza did not report that Sean had assaulted him. His report states that Sean was arrested for disruptive activities and interference with public duties. Sean was previously arrested by Officer De La Garza in October of 1998 for another incident, but was released to his father's custody at the school. (Exhibit 1, p. 5) (Exhibit 8, best copy).

23. "All charges against Sean for the March 1999 incident were dropped by the Juvenile Justice Department when it was acknowledged that Sean had been diagnosed with a disability. The juvenile justice center acknowledged that CCISD had a plan in forced to handle Sean's behavior problems." (Exhibit 1, p. 5).

Page 7

24. Dr. Quintanilla, Sean's psychiatrist, specifically noted that the additional stress and frustration experienced at school by Sean greatly influenced his lowered self-esteem and level of depression. (Exhibit 13). Irreparable harm is likely to occur if Defendants are not enjoined against further arrests and searches of Sean W. for his symptomatic behaviors.

## II. Conclusions of Law

25. Discrimination against and neglect of students with disabilities that involve behavioral manifestations was a key impetus behind the 1975 enactment of what is now called the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. §1400 *et seq*. In passing IDEA, Congress explicitly acted to make real the equal protection rights recognized in *Mills v. District of Columbia Board of Education*, 348 F. Supp. 866 (D.D.C.), which had been brought on behalf of a class of children with disabilities "labelled as behavioral problems, mentally retarded, emotionally disturbed or hyperactive...," *Id.* at 368.

26. Congress acted to end not only the denial of education to these children, but also the provision, to those who ostensibly *were* being schooled, of inadequate and inappropriate education. *Honig v. Doe,* 484 U.S. 035, 108 S.Ct. 592 (1988). Embedded in the history of IDEA is the understanding that for children with behavioral manifestations, access to school is meaningless if not accompanied programming that takes into account behavioral needs.

Page 8

27. The IDEA Amendments of 1997 underscore one aspect of schools' duty to address behavior. 20 U.S.C. §1414(d)(3)(B) as amended by the 1997 legislation provides that as a "special factor," "in the case of a child whose behavior impedes his or her learning or that of others," the IEP team shall "consider, when appropriate, including positive behavioral interventions, strategies, and supports to address that behavior." *See also* 20 U.S.C. §14115(k)(1)(B) (requiring functional behavior assessment and implementation/revision of behavioral intervention plan after disciplinary actions); 20 U.S.C. §1415(k)(3) (requiring that the "interim alternative educational setting" into which children may be placed following certain incidents involving dangerous weapons or drugs, or upon a finding by a hearing officer that maintaining a child in his or her current placement is substantially likely to result in injury to the child or others, include services to address the behavior that triggered the placement change). This provision makes explicit in the statute the long-standing IDEA requirement, derived from the statutory definitions of "special education," and "related services," that schools provide the essential element of an appropriate education to develop skills that would allow the student to be as self-sufficient as possible and to function outside of an institution".

28. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132 *et seq.*, entitle

students with behavioral disabilities to appropriate opportunities to learn what all other children are expected to know and be able to do -- "standards," or skills and competencies embodied in the regular or general curriculum.

**29.** *Stacey G. v. Pasadena Independent School District*, 547 F.Supp. 61, 77 (S.D. Tex. 1982)("...a student whose disabilities entail behavioral consequences requires "special education," or "specially designed instruction," aimed at behavioral issues, as well as any necessary behaviorally-related services)."

**30.** Consistent with the broad notion of education encompassed by the statute, the purpose of addressing non-academic needs such as behavior under IDEA is to enable children with disabilities to function effectively in all settings, not simply in school. In *David D. v. Dartmouth School Committee*, 775 F.2d 411, 423 (1st Cir. 1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1790 (1986), the court held that the school committee's proposed placement did not provide a free appropriate public education, because "although David had performed relatively well in the rather cloistered and familiar environment of the school...in less familiar settings, or where relatively unsupervised, he frequently showed little or no self-control in his conduct towards other persons." Similarly, *Chris D. and Cory M. v. Montgomery County Bd. of Ed.*, 753 F.Supp. 922 (M.D. Ala. 1990), the court rejected as insufficient and a denial of a school's attempt at behavior management, noting that to the extent that the child at times behaved appropriately in class, "it is only because a teacher or other adult is literally standing

over him," and that "[c]learly such a dependency building approach does nothing and in fact may make it more difficult to enable Cory to behave in a regular classroom or in the real world." 753 F.Supp. at 933.

31. The requirement under the regulations implementing §504 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.* that prohibit "criteria and methods of administration" that have the "effect" of subjecting students with disabilities to discrimination. 34 C.F.R. §104.4(b)(4)(implementing §504); 28 C.F.R. §35.130(b)(3)(implementing the ADA).

32. Indeed, courts have recognized that inappropriate school actions can cause, or contribute to, the very "behavior problems" for which schools then penalize students. *See, e.g., Morgan v. Chris L.,* 25 IDELR [Individuals with Disabilities Education Law Report] 227, 230 (6th Cir. January 21, 1997)("[w]hen school systems fail to accommodate a disabled student's behavioral problems, these problems may be attributed to the school system's failure to comply with the requirements of the IDEA"); *Stuart v. Nappi,* 443 F.Supp. 1235, 1241 (D. Conn. 1978)(school's "handling of the plaintiff may have contributed to her disruptive behavior"); *Howard S. v. Friendswood School District*, 454 F.Supp. 634, 640 (S.D. Tex. 1978)(finding that plaintiff, whom school officials sought to expel following a suicide attempt and hospitalization, "was not afforded a free, appropriate public education during the period from the time he enrolled in high school until December of 1976, [which]

Page 11

was... a contributing and proximate cause of his emotional difficulties and emotional disturbance").

33. The Texas Education Code requires that a school district police department and the law enforcement agencies with which it has overlapping jurisdiction shall enter into a memorandum of understanding that outlines reasonable communication and coordination efforts between the department and the agencies. Tex. Ed. Code §37.081 (Vernon 1999).

34. The fourth and fourteenth Amendments to the United States Constitution protect school children from unreasonable searches. *New Jersey v. T.L.L.*, 469 U.S. 325, 105 S.Ct. 733 (1985)(Search by school officials).

35. Jail officials may strip search a person arrested for minor offenses and detained pending bond only if they possess a reasonable suspicion that the detainee is hiding weapons or contraband. *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996). Searches of minor offense arrestees who would be detained for short periods of time are scrutinized closely. *Watt v. City of Richardson Police Dept.*, 849 F.2d 195, 197 (5th Cir. 1988).

```
                              Respectfully submitted
                              WOOLSEY & CASSIDY, P.C.


                              _____
                              Les Cassidy
                              State Bar No. 03979270
                              Federal ID 5931
                              1020 NationsBank Center North
                              500 N. Water Street
                              Corpus Christi, Texas 78471
                              361/887-2965 - Phone
                              361/887-6521 - Fax

                              ATTORNEY FOR PLAINTIFF,
                              SEAN W. bnf MARCIA W.
```

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was forwarded April 24, 2000, by hand delivery to:

Linda Flores Resendez
Corpus Christi ISD
P.O. Drawer 110
Corpus Christi, Texas   78403-0110

Walter Bryan
Nueces County Attorneys Office
901 Leopard, Room 206
Corpus Christi, Texas   78401

John C. Holmgreen, Jr.
Gary, Thomasson, Hall & Marks, P.C.
210 S. Carancahua
Corpus Christi, Texas   78403

_____
Les Cassidy